UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE HILSINGER COMPANY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-10594-IT |
| | * | |
| EYEEGO, LLC, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

September 26, 2016

TALWANI, D.J.

I.    Introduction

The Hilsinger Company ("Hilco") brings this declaratory judgment action asserting that

two patents owned by Eyeego, LLC ("Eyeego"), U.S. Patent Nos. 8,070,403 (the "'403 patent")

and 8,375,546 (the "'546 patent") (collectively, the "Patents-in-Suit"), are invalid and that Hilco

does not infringe them. Eyeego brings counterclaims for infringement of the '403 patent and the

'546 patent.

Before the court are the following motions: (1) Eyeego's Motion for Summary Judgment

Denying Declaratory Judgment of Invalidity of the '403 Patent and the '546 Patent [#116]; (2)

Hilco's Motion for Summary Judgment [#161]; (3) Eyeego's Motion for Summary Judgment of

Infringement of the '403 Patent [#172]; and (4) Hilco's Motion to Strike the Declarations [#191].

Hilco claims that Eyeego lacks standing to bring its infringement counterclaims because Eyeego

had assigned away the rights to the Patents-in-Suit. Additionally, the parties cross move on

whether the Patents-in-Suit are valid and on whether Hilco infringed the Patents-in-Suit.

 The court finds that Eyeego has standing to bring its infringement counterclaims, but that

the Patents-in-Suit are invalid as anticipated in part by the prior art and as obvious in light of the

prior art. Because the Patents-in-Suit are invalid, the court finds that Hilco does not infringe the

Patents-in-Suit. Additionally, the court strikes certain inadmissible evidence propounded by

Eyeego.

Accordingly, Hilco's motion for summary judgment [#116] and motion to strike [#191]

are ALLOWED, and Eyeego's motions for summary judgment [#161, #172] are DENIED.

II.      Background

    a.  *Patents-in-Suit*

The two patents-in-suit share a priority date of August 6, 2007. See Eyeego's Statement

Material Facts Supp. Mot. Summ. J. of Invalidity ¶ 3 [#118] ("Eyeego's Stmt. for Eyeego's Mot.

Summ. J. of Invalidity"); Hilco's Statement Material Facts Opp. Eyeego's Mot. Summ. J. of

Invalidity ¶ 3 [#132] ("Hilco's Stmt. for Eyeego's Mot. Summ. J. of Invalidity"). The '403

Patent was issued to Nancy Tedeschi (later assigned to Eyeego) on December 6, 2011, and the

'546 Patent was issued to Tedeschi (later assigned to Eyeego) on February 19, 2013.

The '403 Patent (entitled "Screw with Breakaway and Methods of Using the Same") is

principally directed to a screw having an elongated tapered end connected to the remainder of the

screw by a narrow section—a "breakaway." The screw described by the '403 Patent is depicted

below:



Decl. Thomas P. McNulty, Ex. A FIG. 4 [#120-1] ("'403 Patent").

The screw has a screw head (15) and an elongated stem (11). The screw head is adjacent to a threaded first portion of the screw (20). A small narrow section (25), a "breakaway," connects that first portion of the screw with a non-threaded second portion (30). The breakaway "releasably couples" the first threaded portion from the non-threaded second portion. '403 Patent, col. 1, ll. 37-39. Releasably coupling, as described in the patent, is "[f]orming or breaking or severing a mechanical and physical coupling." Id. at col. 3, ll. 55-59.

The '403 Patent further has the following attributes:

- The non-threaded portion of the screw may be inserted into the screw hinge such that the non-threaded portion extends out of the bottom of the hole of the hinge, stabilizing the screw within the screw hole, and thus making it easier for the user to align the threaded first portion of the screw with the threaded channel of the screw hinge. Id. at col. 6, ll. 56-60, 65-67. This extension of the non-threaded portion also allows the user to grip and manipulate the screw from below the hinge by hand, without the use of tools. Id. at Cl. 26.

- The non-threaded portion of the screw may be removed by hand (via the breakaway)

from the threaded portion of the screw once the threaded portion of the screw catches

at least one thread in the threaded channel of the screw hinge, leaving what appears to

be a regular screw in the hinge. Id. at col. 7 ll. 38-41.

The '546 Patent is a divisional application of the '403 Patent, and it discloses a kit

comprising a hinge and the screws of the '403 Patent.

      *b.  The SnapIt Screw and the Accused Product*

In October 2009, Nancy Tedeschi met with Hilco's Director of Marketing Bob Woyton

and Paula Fazio, another employee of Hilco, in hopes of setting up a distribution agreement with

Hilco for her SnapIt Screw, a screw that embodied the claims of the '403 Patent. See Eyeego's

Stmt. for Eyeego's Mot. Summ. J. of Invalidity ¶¶ 9-10; Hilco's Stmt. for Eyeego's Mot. Summ.

J. of Invalidity ¶¶ 9-10. Tedeschi showed Woyton and Fazio the SnapIt Screw. Id. ¶ 10. Hilco

conducted a product evaluation and initial patent review of the screw, but decided not to

distribute the SnapIt Screw. Id. ¶ 12. Soon after, Hilco began to produce the Thread Seeker XLT

screw, a screw with a non-threaded bottom portion below a breakaway. Id. ¶13.

      *c.  License and Assignments of the Patents-in-Suit and Procedural History*

In December 2012, Eyeego executed an exclusive license agreement with OptiSource

International ("OptiSource"). Hilco's Statement Material Facts Supp. Mot. Summ. J. ¶ 61 [#163]

("Hilco's Stmt. for Hilco's Mot. Summ. J.") (citing Decl. James L. Tuxbury, Ex. Z [#166-18]);

Eyeego's Resp. Hilco's Statement Material Facts Supp. Mot. Summ. J. ¶ 61 [#206] ("Eyeego's

Stmt. for Hilco's Mot. Summ. J."). Under the agreement, Eyeego granted OptiSource the

"exclusive right and license to make, have made, use, sell, offer to sell and import" products

using the Patents-in-Suit in the United States and Canada, and the "right to grant sublicenses"

within that territory "consistent with [the] Agreement." Decl. James L. Tuxbury, Ex. Z ¶ 2(a)

[#166-18]. Eyeego, however, retained the right and obligation to bring suit against Hilco and collect all or some of the proceeds from that action. Id. ¶ 14(a). OptiSource could not bring or settle any claims of infringement of the Patents-in-Suit without the written consent of Eyeego. Id. ¶ 14(b). And, if OptiSource and Eyeego could not come to an agreement on whether to bring claims against third party infringers, Eyeego could bring suit against them if OptiSource chose not to do so. Id. ¶ 14(b)(1).

In March 2013, Hilco brought suit against Eyeego for declaratory judgment on two counts: that Hilco was not infringing the '403 Patent owned by Eyeego, and that the '403 Patent was invalid. See Compl. [#1]. Hilco later amended its Complaint to include two additional counts for declaratory judgment: that Hilco was not infringing upon the '546 Patent owned by Eyeego, and that the '546 Patent was invalid. See Am. Compl. [#8]. Eyeego brought counterclaims against Hilco for infringing the '403 patent and infringing the '546 Patent. Answer & Countercl. [#4].[1]

In August 2013, Eyeego assigned its rights to SnapIt Screw, LLC (an entity created by Tedeschi), which in turn transferred those rights to FBB Asset Management, LP ("FBB") (another entity created by Tedeschi) in September 2013. Third Decl. James L. Tuxbury, Ex. BB [#188-19] (assignment from Eyeego to SnapIt Screw, LLC on August 7, 2013) & CC [#188-20] (assignment from SnapIt Screw, LLC to FBB on September 3, 2013). FBB transferred the rights

---

[1] Eyeego asserts that Hilco infringes the following claims with its Thread Seeker XLT screw, and Hilco asserts that the same claims are invalid: '403 Patent Claims 1, 4, 5, 8, 10, 16, 17, 19, 21, 24, 26, 28, 30, 33, 45, 53, 55, 57, 58, and 62, and '546 Patent Claims 1, 2, 7-11, and 16-21. See Eyeego's Stmt. for Eyeego's Mot. Summ. J. of Invalidity ¶ 4 [#118]; Hilco's Stmt. for Eyeego's Mot. Summ. J. of Invalidity ¶ 4 [#132]; Eyeego's Statement Material Facts Supp. Mot. Summ. J. of Infringement ¶¶ 13-35 [#174] ("Eyeego's Stmt. for Eyeego's Mot. Summ. J. of Infringement").

back to Eyeego in March 2016. Decl. Thomas P. McNulty Supp. Eyeego, LCC's Reply, Ex. A &
B [#197-1, #197-2].

     *d.   Prior Art*

     Hilco comes forward with two sets of what it asserts are prior art that renders the Patents-
in-Suit invalid.

     The Sadler Screw, as seen in catalogs starting in 1999, has the attributes of a threaded
portion separated from a non-threaded second portion by a breakaway.



Decl. Thomas Sadler, Ex. A. [#164-1].

     The CentroStyle Screw, depicted in a catalog from 2003, appears to have a threaded
portion of a screw separated from an elongated non-threaded portion of the screw by a narrower
breakaway:



<u>See</u> Decl. James L. Tuxbury, Ex. M. [#166-5] (CentroStyle 2003 catalog). The catalog instructs

users to "[s]nap-off the end when in place" and includes a picture, reproduced and discussed

below, demonstrating how this is to be done. <u>Id.</u> at 8.

III.     <u>Discussion</u>

    *A.*     *Standing*

    "Federal courts are courts of limited jurisdiction and, thus, we must begin by ensuring

that we have jurisdiction to reach the questions presented . . . ." <u>Hochendoner v. Genzyme Corp.</u>,

823 F.3d 724, 730 (1st Cir. 2016). Thus, the court must first address the threshold issue of

whether Eyeego has standing to pursue its infringement counterclaims.

    Hilco alleges that Eyeego lacks standing to pursue its infringement claim based on two

grounds: that Eyeego licensed substantially all rights in the Patents-in-Suit to OptiSource; and

that Eyeego relinquished any remaining interest in the '403 patent when Eyeego assigned its

rights under its licensing agreement with OptiSource to FBB. Neither of these arguments prevail.

As to the OptiSource license, Eyeego did not transfer all substantial rights, as it maintained the

right to sue. As to the FBB assignment, FBB has transferred all of its interest in the '403 back to

Eyeego during this litigation, and Eyeego now holds the rights in that patent.

    *i.*     *OptiSource License*

    Typically only patentees have standing to sue for infringement. <u>See</u> 35 U.S.C. § 281.

Exclusive licensees "may have standing to participate in a patent infringement suit" and "in some cases . . . must still be joined in suit by the patent owner." Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377 (Fed. Cir. 2000). When the exclusive licensee has been granted "all substantial rights" by the patentee such that the license is essentially an assignment, the exclusive licensee, and only the exclusive licensee, has standing to sue for infringement. Alfred E. Mann Found. For Sci. Research v. Cochlear Corp., 604 F.3d 1354, 1358-59 (Fed. Cir. 2010). When determining whether a license agreement constitutes a grant of "all substantial rights," effectively turning the license into an assignment, the court examines the intention of the parties and the substance of the agreement, not the labels assigned by the parties. Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1340 (Fed. Cir. 2006).

Hilco argues that the December 2012 exclusive licensing agreement granted OptiSource "all substantial rights" under the Patents-in-Suit. The licensing agreement gave OptiSource the right to make, use, sell, offer to sell, and import products using the Patents-in-Suit; the right to enforce the '403; and the right to sublicense within the United States. See Aspex Eyewear, 434 F.3d at 1342 (describing this bundle of rights as "often associated with ownership of a patent."). The licensing agreement, however, did not transfer "all substantial rights" (emphasis added). Under the agreement, Eyeego retained at least part of the right to sue for infringement. First, Eyeego retained the right and the obligation to bring suit against Hilco and collect all or at least part of the proceeds from that action. Decl. James L. Tuxbury, Ex. Z ¶ 14(a) [#166-18]. Second, Eyeego retained certain rights to enforce the Patents-in-Suit against third-party infringers. OptiSource could not bring or settle any claims of infringement of the Patents-in-Suit without the written consent of Eyeego. Id. ¶ 14(b). And, if OptiSource and Eyeego could not come to an agreement, Eyeego could bring suit against third party infringers if OptiSource chose not to do

so, id. ¶ 14(b)(1), thus preventing OptiSource from "enjoy[ing] the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue." Alfred E. Mann, 604 F.3d at 1363 (citing Abbot Labs. v. Diamedix Corp., 47 F.3d 1128, 1132 (Fed. Cir. 1995)) (holding that licensee did not receive all substantial rights because licensor retained secondary right to sue, following licensee's right of first refusal). This retention of rights is significant, as the scope of the licensee's right to sue infringers is often "the most important consideration" in determining whether a license is effectively an assignment. Alfred E. Mann, 604 F.3d at 1361.[2] Because Eyeego kept certain rights to sue infringers, it did not make a virtual assignment of the Patents-in-Suit to OptiSource.

      ii.    *FBB Assignment*

Hilco also asserts that Eyeego transferred whatever rights it retained in the '403 patent to FBB. Indeed, Eyeego assigned the '403 patent in August 2013 to SnapIt Screw, LLC, which in turn transferred those rights to FBB in September 2013. Third Decl. James L. Tuxbury, Ex. BB [#188-19] (assignment from Eyeego to SnapIt, LLC on August 7, 2013) & CC [#188-20] (assignment from SnapIt, LLC to FBB on September 3, 2013). The parties dispute what transfers and assignments occurred in the years after. But, it is undisputed that FBB transferred the rights back to Eyeego in March 2016. Decl. Thomas P. McNulty Supp. Eyeego, LCC's Reply, Ex. A &

---

[2] OptiSource does retain the right to grant sublicenses. The Federal Circuit has held that a licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses to accused infringers renders illusory the licensee's right to sue. Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1251 (Fed. Cir. 2000). Here, however, the agreement states that the "right to grant sublicenses" must be "consistent with this Agreement." Decl. James L. Tuxbury, Ex. Z ¶ 2(a) [#166-18]. It would not be consistent with the agreement for OptiSource to sublicense to accused infringers—thus effectively settling any suits against those accused infringers—because such a sublicense would make valueless Eyeego's explicit right to bring any actions that OptiSource chooses not to bring and OptiSource' obligation to seek consent from Eyeego before settling any actions.

B [#197-1, #197-2]. Eyeego thus owned the Patents-in-Suit at the time Hilco commenced this

case—March 13, 2013—and when Eyeego brought its counterclaims—March 27, 2013, and

owns the Patents-in-Suit now. See Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198,

1202-04 (Fed. Cir. 2005) (overturning a lower court vacating the judgment on standing grounds

because the plaintiff owned the patent when it filed suit and reacquired the patent before

judgment). The FBB transfer does not eradicate Eyeego's standing to enforce the '403 patent.

> B.    Invalidity

The parties cross-move on the issue of whether the Patents-in-Suit are valid, specifically,

whether they are anticipated by prior art, 35 U.S.C. § 102, or obvious in light of the prior art, 35

U.S.C. § 103.[3]

Each claim of a patent is presumed valid independently of the validity of other claims. 35

U.S.C. § 282. A patentee moving for summary judgment has no burden to present factual

evidence affirmatively establishing the validity of its patent. See Massey v. Del Labs., Inc., 118

F.3d 1568, 1573 (Fed. Cir. 1997). The party asserting patent invalidity must prove a patent is

invalid by clear and convincing evidence. Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962

(Fed. Cir. 2001). "[A] moving party seeking to have a patent held not invalid at summary

judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to

produce clear and convincing evidence on an essential element of a defense upon which a

---

[3] Eyeego also moves for summary judgment on the ground that the Patents-in-Suit are not invalid
because of indefiniteness. Specifically, Eyeego argues that Hilco's contention that the term
"releasably coupled" is indefinite is conclusory and supported by no reasoning. This issue is not
necessary to the court's ruling. But, in any event, Eyeego would not be entitled to summary
judgment on this issue. Hilco has presented expert testimony supporting its indefiniteness
argument sufficient to survive summary judgment. See Expert Report Thomas Woods 7 [#185-1]
(describing the term "releasably coupled" as indefinite because it does not specify the force
required to release the coupling nor the method of manufacture).

reasonable jury could invalidate the patent." Id.[4]

> i.     *Prior Art Qualifies as Printed Publications*

Eyeego first argues that the catalogs Hilco has identified do not qualify as printed publication prior art because Hilco has not put forth any evidence that they were disseminated to the public.

Under 35 U.S.C. § 102, a "person shall be entitled to a patent unless (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent, or (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."[5] "This rule is 'grounded on the principle that once an invention is in the public domain, it is no longer patentable by anyone.'" Blue Calypso, LLC v. Groupon, Inc.,

---

[4] Relying on Local Rule 16.6, Appendix E, Eyeego also asserts that Hilco may make no arguments not made in its Amended Preliminary Invalidity Contentions [#56]. That rule states that an accused infringer "shall identify prior art that anticipates or renders obvious the identified patent claims in question and, for each prior art reference, shall specify whether it anticipates or is relevant to the obviousness inquiry [and] shall also specify any other grounds for invalidity, such as indefiniteness." L.R. 16.6, App'x E. The Invalidity Contentions do so here. The contentions identify both the Sadler Screw and the CentroStyle Screw, and they specify, for each claim, that they are relevant to both invalidity and obviousness. See Am. Prelim. Invalidity Contentions [#56]. The material outside of the invalidity contentions, such as Hilco's expert report, merely provide "more detail as to how the prior art teaches the limitations," which an expert report may do. Verinata Health, Inc. v. Sequenom, Inc., No. C 12-00865 SI, 2014 WL 4100638, at *6 (N.D. Cal. Feb. 25, 2015). Eyeego does not dispute that Hilco timely disclosed its expert according to the schedule ordered by this court. Accordingly, Hilco's expert material is properly before this court on the instant motions.

[5] The America Invents Act changed the statutory language of 35 U.S.C. §§ 102 and 103 for claims that have effective filing dates on or after March 16, 2013. Because the claims at issue have effective filing dates prior to March 16, 2013, the court applies the pre-America Invents Act version of 35 U.S.C. §§ 102 and 103. See Blue Calypso, LLC v. Groupon, Inc., 815 F.3d 1331, 1341 n.4 (Fed. Cir. 2016).

815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting In re Hall, 781 F.2d 897, 898 (Fed. Cir. 1986)).

Whether a reference qualifies as a printed publication under §102 "is a legal conclusion based on

underlying factual determinations." Kyocera Wireless Corp. v. Int'l Trade Com'n, 545 F.3d

1340, 1350 (Fed. Cir. 2008) (quoting Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.,

291 F.3d 1317, 1321 (Fed. Cir. 2002). It is Hilco's "burden of establishing" that the references

were "disseminated to the interested public before the critical date." Blue Calypso, 815 F.3d at

1349 (finding that party seeking to show that reference was printed publication failed to carry

burden when they presented only general statement from that party's expert that reference was

publicly available online without evidence that anybody viewed or downloaded reference or that

a query of a search engine would have led to it).

A reference "must have been sufficiently accessible to the public interested in the art" to

be considered a printed publication under 35 U.S.C. § 102. In re Cronyn, 890 F.2d 1158, 1160

(Fed. Cir. 1989). "Public accessibility" is the "touchstone in determining whether a reference

constitutes a 'printed publication'". Blue Calypso, 815 F.3d at 1348 (quoting In re Hall, 781 F.2d

at 898-99). A reference is considered publicly accessible if it was "disseminated or otherwise

made available to the extent that persons interested and ordinarily skilled in the subject matter or

art exercising reasonable diligence, can locate it." Id. (quoting Kyocera, 545 F.3d at 1350).

"Whether a reference is publicly accessible is determined on case-by-case basis based on the

'facts and circumstances surrounding the reference's disclosure to members of the public.'" In re

Lister, 583 F.3d 1307, 1311 (Fed. Cir. 2009) (quoting In re Klopfenstein, 380 F.3d 1345, 1350

(Fed. Cir. 2004)).

Hilco has sufficiently demonstrated that the two pieces of prior art on which it relies—the

Sadler Screw catalogs and the CentroStyle Screw catalog—were disseminated to the public

before the August 6, 2007, priority date and therefore each independently qualifies as a printed publication.

As to the Sadler Screw catalog, Hilco offers the Declaration of Thomas Sadler, now the Director of Engineering at Hilco. Sadler, who was the President of Sadler Brothers, the manufacturers of the Sadler Screw, declares that he sold the Sadler Screw from 1999 until at least 2006, and that he distributed catalogs to sell the Sadler Screw to 30,000 optical professionals via inclusion in optical trade publications. Decl. Thomas Sadler ¶¶ 1-2, 7 [#184]; see also Hilco's Stmt. for Hilco's Mot. Summ. J. ¶ 3. The catalogs, dated 2000/2001, 2002/2003, 2003/2004, and 2006/2007, contained pictures of the Sadler Screw. See Decl. Thomas Sadler, Ex. C-H [#164-3 to #164-8]. This evidence of distribution of the catalogs satisfies the dissemination requirement of 35 U.S.C. § 102. See Mass. Inst. of Tech. v. AB Fortia, 774 F.2d 1104, 1109 (Fed. Cir. 1985) (paper presentation that was handed out at conference counted as printed publication).

Eyeego argues that Sadler's testimony as to his catalogs should be disbelieved because it is uncorroborated. "Summary judgment should not be denied simply because the opposing party asserts that the movants witnesses are not to be believed. However, summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movants witnesses . . . ." TypeRight Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1158-59 (Fed. Cir. 2004). Eyeego points out that, because Sadler is now an employee of Hilco, if Sadler had evidence of dissemination, Hilco would now have evidence of dissemination of the Sadler Screw catalogs that it could have produced in this litigation, but did not.[6]

---

[6] Hilco purchased Sadler's company, Sadler Brothers, in 2007. See Eyeego's Stmt. for Eyeego's Mot. Summ. J. of Invalidity ¶ 24; Hilco's Stmt. for Eyeego's Mot. Summ. J. of Invalidity ¶ 24.

Sadler's testimony, however, is not completely without corroboration—the catalogs do have dates—and, there are not myriad reasons to discredit his testimony. Cf. TypeRight, 374 F.3d at 1158 (fact that purported prior art—the subject of witness's testimony—was undated, that witness testified about events occurring nearly 20 years before, that there was a discrepancy between asserted date of publication and year of the date on the file in which the prior art was kept, were reasons to deny summary judgment).[7]

As to the CentroStyle Screw, Hilco brings forth the testimony of Paula Fazio, an employee at Hilco who, as part of her employment, collected "catalogs of Hilco's competitors and suppliers." Decl. Paula Fazio ¶¶ 1, 2 [#187]. She testified in her deposition that, in the ordinary course of business, she received those catalogs through publicly accessible means, including at trade shows, and maintained them. Second Decl. James L. Tuxbury, Ex. D. [#134-4] (Deposition of Paula Fazio, 59:7-69:19, 65:14-19). She further testified at her deposition that she only stored and filed current catalogs, and has never maintained and filed a catalog that was out of date. Id. at 91:14-92:2; see also Decl. Paul Fazio [#187] ¶¶ 3-8. Among the catalogs collected and produced in this litigation was the 2003 CentroStyle catalog. Decl. Paula Fazio ¶ 9. Given her production of the 2003 CentroStyle catalog and her testimony that she always filed and stored only current catalogs, the court can infer that Fazio received the CentroStyle catalog in 2003, before the priority date of August 6, 2007.

Eyeego argues that Fazio had no independent recollection of when she received each catalog, apart from the printed date of the catalog. It would be difficult, however, to hold Fazio to remembering when she received each particular catalog. It is enough that she has testified that

---

[7] Additionally, Tedeschi appeared to admit that, in 1999, she was aware that Sadler was selling the Sadler Screw through its catalogs. Third Decl. James L. Tuxbury, Ex. I [#188-1] (Deposition of Eyeego (Rule 30(b)(6)), 265:22-266:24).

she generally filed catalogs by date (given that the catalogs at issue are dated).

In any event, the dates printed on both the Sadler Screw and the CentroStyle catalogs provide further corroboration that they were publicly disseminated prior to the August 6, 2007. See Jockmus v. Leviton, 28 F.2d 812, 814 (2d Cir. 1928) (That a catalog was "printed in 1908 no one can reasonably doubt; it was a trade catalogue, meant to pass for a season and to be superseded . . . ." And, although it is "conceivable that, though printed, it was never distributed," "no one can seriously suppose that [a catalog,] printed in quantity, was intended to be kept secret.").

Accordingly, there is no disputed fact that the CentroStyle and Sadler Screw catalogs were disseminated to the public, and therefore each of the catalogs independently qualifies as prior art.

> ii.     *Prior Art Anticipates Some, but not All the Claims in the Patents-in-Suit*

A patent is invalid for anticipation if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). If every element in a claim is found—expressly or inherently—in a single prior art reference, then the claim is anticipated and invalid. See Planet Bingo, LLC v. Gametech Int'l, Inc., 472 F.3d 1338, 1346 (Fed. Cir. 2006). This is so even where the prior art reference did not appreciate or recognize the "inventive concept" of the invention claimed in the challenged patent. Verdegaal Bros., Inc. v. Union Oil Co. of Cal., 814 F.2d 628, 633 (Fed. Cir. 1987); see also Abbott Labs. v. Baxter Pharm. Prods. Inc., 471 F.3d 1363, 1367 (Fed. Cir. 2006) ("Our cases have consistently held that a reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time.").

The parties first dispute as to whether the prior art anticipates the following element: *wherein the breakaway has a diameter sized so that the non-threaded second portion is directly decoupled from the threaded first portion of the elongated stem at the breakaway **by hand, without the use of a tool***. '403 Patent, Cl. 1 (emphasis added); see also Cl. 16 (which depends from Claim 1). Hilco argues that both the Sadler Screw and the CentroStyle Screw, as depicted in the catalogs, were breakable by hand; Eyeego disputes this.

Hilco offers Sadler's deposition testimony that at trade shows he would break off by hand the non-threaded portion of the Sadler Screw for demonstration. See Hilco's Stmt. for Hilco's Mot. Summ. J. ¶ 13 (citing Decl. James L. Tuxbury, Ex. K [#166-3] (Deposition Thomas Sadler, 19:15-24, 30:5-12)). Hilco also offers the Expert Report of Thomas A. Woods ("Woods Report") asserting that Woods witnessed "Sadler breaking off the non-threaded second portion of the Sadler Screw from the threaded first portion at the breakaway by hand." See Hilco's Stmt. for Hilco's Mot. Summ. J. ¶ 15 (citing Woods Report 9 [#165-1]).

That the catalog itself did not specifically instruct users to remove the non-threaded second portion by hand does not detract from that evidence, as "a reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time." Abbot Labs., 471 F.3d at 1367; see also Titanium Metals Corp. v. Banner, 778 F.2d 775, 782 (Fed. Cir. 1985) (prior art anticipated a feature even when there was no sign that the authors of the prior art understood those features).

Eyeego seeks to introduce a document that is part of the file history of the '403 Patent—the declaration of Jim Heil—to rebut Hilco's showing that the Sadler Screw was not breakable by hand. See Decl. Thomas P. McNulty, Ex. A [#180-1]. The court allows Hilco's motion to strike the document. Unlike the affidavit or declaration of an individual offering testimony that

would be given at trial, this submission—offered here as an exhibit to counsel's affidavit, and presumably as an exhibit that would be offered at trial—is an out-of-court statement. And, because Eyeego attempts to introduce Heil's statement for the truth of the matter asserted within it—that that the Sadler Screw is not breakable by hand—it is inadmissible hearsay. See Fed. R. Evid. 801(c)(2).

Even if the Eyeego were offering the Heil declaration as the testimony that would be offered at trial, it is still subject to the motion to strike for lack of disclosure. Eyeego argues that Hilco knew or should have known that Eyeego might rely on Heil's testimony because the declaration was part of the disclosed '403 file history. If Heil was being offered as a fact witness as Eyeego contends, the presence of the declaration in the file history may have been sufficient disclosure. But, Heil's declaration amounts to expert testimony; Heil did not testify to his personal observations when examining the screws. Instead, he testifies in the declaration that the Sadler Screw is *not capable* of being broken off by hand because "[s]ignificant sideward pressure is required to re-align the leaf spring with the hinge thus rendering a screw that could break off easily by hand **useless** to" repair or be installed in eyeglasses hinges. See Decl. Thomas P. McNulty, Ex. A ¶¶ 8-9 [#180-1] (emphasis in the original). Because Heil's testimony would be that of an expert witness, and Eyeego failed to disclose Heil as an expert in the disclosures required by Federal Rule of Civil Procedure 26(a)(2)(B), Heil cannot testify at trial. Accordingly, Eyeego cannot rely on Heil's declaration.

Eyeego does not bring forth any additional evidence as to breakability besides the stricken Heil declaration, but instead argues that the testimony of Sadler is suspect because it is

uncorroborated by documentary evidence.[8] Indeed, "corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1369 (Fed. Cir. 1999). Uncorroborated oral testimony put forward to prove prior use of prior art "must be regarded with suspicion and close scrutiny." Carella v. Starlight Archery & Pro Line Co., 804 F.2d 135, 138 (Fed. Cir. 1986), amended on reh'g sub nom. Carella v. Starlight Archery, No. 86-728, 1986 WL 1154370 (Fed. Cir. Dec. 16, 1986); see also Lockheed Aircraft Corp. v. United States, 553 F.2d 69, 75 (Ct. Cl. 1977) (The "oral testimony of witnesses, speaking only from memory in regard to past transactions has, in the absence of contemporaneous documentary or physical evidence, consistently been found to be of little probative value . . . [and] insufficient to show anticipation . . . of an issued patent."). Here, however, there is corroboration. Hilco's expert testified that he personally witnessed Sadler demonstrating breaking off the second portion of the Sadler Screw by hand. See Hilco's Stmt. for Hilco's Mot. Summ. J. ¶ 15.

As to the CentroStyle Screw, Hilco comes forth with the 2003 CentroStyle catalog. Id. ¶ 28 (citing Decl. James L. Tuxbury, Ex. M 8 [#166-5] (CentroStyle catalog)). The catalog instructed users to "[s]nap-off" (not "cut-off" or "clip-off") the non-threaded portion of the CentroStyle Screw, and includes a drawing of a thumb, with a thumbnail and the outline of the knuckle, and the index finger adjacent to it holding the end:

---

[8] Particularly, Eyeego notes that Hilco now owns Sadler Brothers, and that because of that ownership Hilco should have had access to corroborating documents.



Aligns itself when you place-in
Snap-off the end when in place

Eyeego argues that the drawing above depicts pliers, and not a hand. Eyeego propounds the declarations of Ana Mottie and Michael Vopelak, who testify in their affidavits that they attended a trade show in February 2016, during which a CentroStyle representative told them that the above drawing depicted a set of pliers. Decl. Ana Mottie ¶¶ 3-7 [#178]; Decl. Michael Vopelak ¶¶ 2-6 [#179]. The court allows Hilco's motion to strike these declarations as inadmissible hearsay. Both rely on the statement of an out-of-court witness—the CentroStyle representative—to prove the truth of the matter asserted in that statement—that the drawing depicted pliers, not a hand. See Fed. R. Evid. 801(c)(2). Eyeego offers no other evidence of the purported pliers. Notably, no set of pliers that looks like the drawing is depicted for sale in this CentroStyle catalog, or depicted anywhere else in the summary judgment record. See Decl. James L. Tuxbury, Ex. M. [#166-5].

There are therefore no disputed facts that prevent Hilco from showing by clear and

convincing evidence that the prior art teach the breakability by hand limitation.[9]

However, the prior art does not anticipate other limitations in the asserted claims—other than Claims 1 and 16. Claim 4 of the '403 Patent has one of those limitations: "*wherein a length of the non-threaded second portion is greater than or equal to a length of the threaded first portion, resulting in a user having greater leverage to break off and discard the non-threaded second portion at the breakaway.*"[10] Hilco argues that both the Sadler Screw and CentroStyle Screw prior art contain the limitation of having a second non-threaded portion greater than or equal to in length a first threaded portion.

Hilco propounds the following photograph with annotations of the Sadler Screw, the screw depicted in the Sadler Screw catalogs:



---

[9] The limitation in Claim 1 is also the only one disputed in the '546 Patent. Because the court finds that the prior art anticipates Claim 1, the court also finds that the prior art anticipates the asserted claims in the '546 Patent.

[10] Claims 5 and 8 of the '403 Patent depend from Claim 4. Claims 10, 19, 28, and 55 from the '403 Patent each independently add this limitation. Accordingly, whether the prior art anticipates those claims depends on whether the prior art anticipates Claim 4.

Decl. Thomas Sadler, Ex. B [#164-2].

Hilco measures the portion of the screw with the threads as about 1.97 millimeters and the non-threaded portion below the breakaway as about 2.59 millimeters, making the non-threaded portion longer than the threaded portion. See Hilco's Stmt. for Hilco's Mot. Summ. J. ¶ 16 (quoting Woods Report at 10-11).

Hilco misreads the limitation in the '403 Patent. In looking at the '403 Patent as a whole, the term "threaded first portion" refers to the entire part of the screw between the screw head and the breakaway, not just the length of the screw with the threads on it. The words of a claim are generally given their ordinary and customary meaning in the context of both the particular claim in which the disputed term appears but also in the context of the entire patent, including the specification. Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The specification includes a figure as reproduced below:



'403 Patent FIG. 4.

The figure appears to depict a length (L1), which extends from the bottom of the screw head (A), not the top of the portion with the actual threads on it, to the beginning of the

breakaway section (C). The specification further details Figure 4 as depicting a "threaded first portion" of the screw as "adjacent to the head" of the screw. '403 Patent, col. 5, ll. 60-61.

Accordingly, the patent appears to consider the "threaded first portion" of the screw to be not just the portion of the screw with the threads on it, but the entire part extending from the bottom of the screw head to the breakaway.[11] When measuring that portion of the Sadler Screw with the bottom non-threaded second portion of the Sadler Screw, the "threaded first portion" might actually be *longer* than the non-threaded second portion.[12]

As to the CentroStyle Screw, as depicted in the CentroStyle catalog, Hilco provides no measurements to show that the first threaded portion is longer than the second non-threaded portion of the screw. Hilco provides the opinion of expert Thomas Woods,[13] who opines that the "non-threaded portion of the CentroStyle . . . Screw[] is greater than or equal to the length of the threaded first portion," but Woods' opinion appears to rely on the incorrect interpretation of the term "threaded first portion" from the '403 Patent. Woods Report at 10.

Accordingly, there are disputed facts sufficient to prevent Hilco from showing by clear and convincing evidence that the prior art anticipates the limitation on the comparative length of

---

[11] Hilco argues that the plain meaning of the term "threaded"—here, meaning "with threads"—must not be disregarded in interpreting the term "threaded first portion." However, a court may "depart from [a] plain meaning" when the "patentee sets out a definition and acts as his own lexicographer." Info-Hold, Inc. v. Applied Media Techs. Corp., 783 F.3d 1262, 1266 (Fed. Cir. 2015). The '403 Patent provides its own definition here.

[12] Eyeego, however, has not shown that this fact is undisputed for purposes of its own motion for summary judgment. It has propounded no measurements showing that the threaded first portion of the Sadler Screw and the CentroStyle Screw are in fact longer than the non-threaded second portion, other than measurements that are unsupported by evidence on the record and presented as mere attorney argument.

[13] Woods is a consultant in the field of ophthalmic dispensing, and he has worked in that field for over 24 years. Woods Report at 1.

the portions of the screw from Claim 4 and the other claims with this same limitation.

Finally, Claims 17, 26, 45, 53, and 62 contain—with minor differences in claim language—the limitation that the non-threaded second portion of the screw be long enough to extend out of the barrel of the hinge of the eyeglasses into which it is inserted so that the user could pull the screw by the second portion into engagement with the threads.[14]

Hilco argues that the CentroStyle Screw catalog instructs users to snap off the non-threaded second portion by hand (thus implying that the CentroStyle extended through the eyeglass hinge so that it could be manipulated by hand), and that Woods opines in his expert report that he has personally been able to insert the Sadler Screw into an eyeglass hinge such that the distal end of the non-threaded portion extended out of the threaded channel, and that he was able to further pull the Sadler Screw into the threaded channel. See Hilco's Stmt. for Hilco's Mot. Summ. J. ¶¶ 17 (citing Woods Report at 13-14), 28. The claims at issue, however, appear to describe with precision the limitation of the relevant claims: that the non-threaded second portion is long enough such that that portion *itself* could be pulled directly into the threaded channel of

---

[14] Claim 17 contains the limitation "wherein at least the distal end of the non-threaded second portion extends out of a threaded channel of a hinge, enabling the screw to be directly pulled into the threaded channel by hand, by a user, without the use of a tool." Claims 19, 21, and 24 depend on Claim 17. Claim 26 contains the limitation "wherein at least the distal end of the non-threaded second portion extends out of a threaded channel of a hinge, enabling the screw to be aligned by manipulating the non-threaded second portion directly by hand by a user without the use of a tool." Claims 28, 30, and 33 depend from Claim 26. Claim 45 contains the limitation "enabling the screw to be manipulated by the non-threaded second portion directly by hand by a user without the use of a tool." Claim 53 contains the limitation "enabling the screw to be inserted into a threaded channel of a hinge by the non-threaded second portion directly by hand by a user without the use of a tool, so that threads of the threaded channel are not engaged by the non-threaded second portion as the non-threaded second portion is removed from the threaded channel." Claims 55, 57, and 58 depend from Claim 53. Claim 62 contains the limitation "enabling the screw to be manipulated by the non-threaded second portion directly by hand by a user without the use of a tool as the non-threaded second portion is removed from the threaded channel."

the hinge without any further manipulation. See '403 Patent Cl. 17 ("enabling the screw to be *directly pulled* into the threaded channel by hand"); 26 ("enabling the screw to be aligned by *manipulating the non-threaded second portion directly* by hand"); 45 ("enabling the screw to be *manipulated by the non-threaded second portion directly by hand*"); 53 ("enabling the screw to be inserted into a threaded channel of a hinge *by the non-threaded second portion directly by hand*"); 62 ("enabling the screw to be *manipulated by the non-threaded second portion*") (emphasis added). At the very least, there is a dispute of fact as to whether the prior art anticipates these claims.

### iii.    The Patents-in-Suit are Obvious in light of the Prior Art

A patent is invalid as obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art . . . ." 35 U.S.C. § 103(a) (pre-America Invents Act). Obviousness is a question of law, but based on underlying findings of fact. See Sakraida v. Ag Pro, Inc., 425 U.S. 273, 280 (1976). That determination includes (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill of one in the art; and (4) where in evidence, so-called secondary considerations, such as commercial success, long-felt but unsolved needs, and the failures of others. Graham v. John Deere Co. of Kan. City, 383 U.S. 1, 17-18 (1966); see also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007).[15]

---

[15] This court must examine all four of the factors under Graham before finding a patent to be obvious. See Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342, 1360 (Fed. Cir. 2012). The court has already opined on the scope and content of the prior art, and the parties do not dispute the level of ordinary skill in the art. Accordingly, the court first discusses the differences between the prior art and the Patents-in-Suit, and then the secondary considerations of non-obviousness.

In looking at prior art to determine obviousness, courts can consider whether two or more pieces of prior art could have been combined to create the claimed patent or whether a single piece of prior art could have been modified to create it. Comaper Corp. v. Antec, Inc., 596 F.3d 1343, 1351–52 (Fed. Cir. 2010). "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR, 550 U.S. at 418. However, a patent is likely to be obvious if it merely yields predictable results by combining "familiar elements according to known methods." Id. at 416. In fact, one "of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of the invention a known problem for which there was an obvious solution encompassed by the patent's claims." Norgren Inc. v. Int'l Trade Comm'n, 699 F.3d 1317, 1323 (Fed. Cir. 2012) (quoting KSR, 550 U.S. at 419-20). "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the matter claimed," including the "problem motivating the patentee." Id. (quoting KSR, 550 U.S. at 420) (alterations in the original).

One seeking to invalidate patent claims has the burden to prove obviousness by clear and convincing evidence. Norgren, 669 F.3d at 1322. However, where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." KSR, 550 U.S. at 427.

It would have been obvious to one of ordinary skill in the art to modify either of the prior art references to achieve the invention from the Patents-in-Suit. There is little difference between the prior art and the claims of the Patents-in-Suit. The crux of Eyeego's invention was a "screw that is able to be broken by hand without the use of a tool." Decl. James L. Tuxbury, Ex. I [#166-

1] (Deposition of Eyeego (Rule 30(b)(6)), 96:15-17). Both the Sadler Screw and the CentroStyle Screw contain this limitation.

The only potential differences between the prior art and the Patents-in-Suit are that the first threaded portion of the described screw is no longer than the second non-threaded portion and that the screw could be aligned by pulling directly the non-threaded portion from below. This, without any difference in breakability without tools, adds "nothing of patentable consequence." <u>In re Huai-Hung Kao</u>, 639 F.3d 1057, 1070 (Fed. Cir. 2011).

Indeed, the prior art taught towards the limitations that were arguably new in the Patents-in-Suit. In particular, the CentroStyle catalog displays a hand breaking off the non-threaded portion of the screw by hand from the bottom portion of the eyeglasses hinge:



<u>See</u> Decl. James L. Tuxbury, Ex. M 8 [#166-5] (CentroStyle catalog). At best, the additional limitations—a longer non-threaded portion and a screw that can be aligned by pulling on the non-threaded portion from the bottom—make slightly easier what is depicted in the CentroStyle catalog. <u>See</u> <u>Norgren</u>, 699 F.3d at 1326 (noting that addition of element did not save patent from being obvious because the addition was a "common sense solution"). At worst, the additional limitations and, for that matter, the SnapIt Screw invention itself, evidence only the patentee's

recognizing that a screw's breakability could be the focus of marketing. In other words, the patentee recognized an inventive concept in the prior art references previously unrecognized and capitalized on that inventive concept.

Eyeego makes two arguments in support of its motion on invalidity and against Hilco's motion. First, Eyeego argues that Hilco failed to provide any evidence of a motivation to combine or modify any prior art references. But, this failure does not compel a finding of non-obviousness or prevent a finding of obviousness. "Neither the particular motivation nor the avowed purpose of the patentee controls." KSR, 550 U.S. at 419. Instead, what "matters is the objective reach of the claim.  If the claim extends to what is obvious, it is invalid under §103." Id. This may include "noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." Id. at 420. As the Supreme Court has stated, although "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does, . . . the obviousness analysis cannot be confined by a formalistic conception of the . . . motivation." Id. at 418-19.

Based on KSR, Hilco is not subject to a "requirement [to show] an explicit motivation to combine" or modify a prior art reference. Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc., 555 F.3d 984, 993 (Fed. Cir. 2009) (improper to deny summary judgment because of "conclusory statements in lieu of an explanation of a motivation to combine"). Instead, evidence "of a motivation to combine prior art references [or modify one prior art reference] may flow from the nature of the problem to be solved." Dome Patent L.P. v. Lee, 799 F.3d 1372, 1380 (Fed. Cir. 2015) (internal quotation marks omitted). If "a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." Ball Aerosol, 555 F.3d at

992 (quoting KSR, 550 U.S. at 417). Here, the expert witness did not identify a motivation to modify the prior art references. But, the court finds that the Patents-in-Suit merely implement a predictable variation of the prior art. See Wyers v. Master Lock Co., 616 F.3d 1231, 1239 (Fed. Cir. 2010) ("KSR and our later cases establish that the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony.").

Eyeego then argues that secondary considerations of non-obviousness preclude a finding of obviousness. So-called "secondary considerations" may be used to rebut a prima facie assertion of obviousness. Graham, 383 U.S. at 17-18.  Secondary considerations include commercial success, long felt but unsolved needs, failure of others, copying, and unexpected results.  Id.; see also Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 894 (Fed. Cir. 1984).

Eyeego first argues that there is evidence of Hilco's deliberately copying the SnapIt Screw. Copying "requires evidence of efforts to replicate a specific product, which may be demonstrated through internal company documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a replica, or access to the patented product combined with substantial similarity to the patented product." Wyers, 616 F.3d at 1246.

Hilco had access to the SnapIt Screw. It is undisputed that the patentee, Nancy Tedeschi, met with Bob Woyton and Paula Fazio of Hilco in October 2009, where she showed them the SnapIt Screw. Eyeego's Stmt. for Eyeego's Mot. Summ. J. of Invalidity ¶¶ 9-10 [#118]; Hilco's Stmt. for Eyeego's Mot. Summ. J. of Invalidity ¶¶ 9-10 [#132]. And, Hilco's engineering department conducted a product evaluation and initial patent review of the screw. Id. ¶ 11.

Although that evidence is scant, it might have been enough for Eyeego to survive

summary judgment on obviousness. However, "[e]vidence of copying of a feature in a patent owner's commercial product is 'not sufficient to demonstrate nonobviousness of the claimed invention' where, as here, there is a 'substantial question of validity raised by the prior art references' cited by the accused infringer." Apple Inc. v. Samsung Elecs. Co., Ltd., 816 F.3d 788, 806 (Fed. Cir. 2016) (quoting Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1366 (Fed.Cir.2001)). The court has found that there is a substantial question of validity raised by the prior art references, and so this scant evidence of potential copying is "not sufficient." Id.

Eyeego also brings forth some evidence of awards that the patentee has received for the SnapIt Screw. See Decl. Thomas McNulty, Ex. M-Q [#120-13 to #120-17].[16] Such "industry recognition of the achievement of the invention, such as awards, may suggest nonobviousness . . . ." Apple, 816 F.3d at 805. But, again, "secondary considerations of nonobviousness . . . simply cannot overcome a strong prima facie case of obviousness, [especially where] the inventions represented no more than the 'predictable use of prior art elements according to their established functions.'" Wyers, 616 F.3d at 1246 (quoting KSR, 550 U.S. at 417). The limitations in the Patents-in-Suit that are not found in the prior art references are just predictable variations from the elements of the Sadler Screw and the CentroStyle Screw. The patentee's awards cannot overcome this strong case of obviousness.

C.    Infringement

There "can be no . . . infringement of invalid patent claims." Prima Tex II, L.L.C. v. Polypap, S.A.R.L., 412 F.3d 1284, 1291 (Fed. Cir. 2005). Because the asserted claims of the

---

[16] Eyeego states that it has had commercial success, generating worldwide sales of the SnapIt Screw in a short time. But, this argument is without support in the record.

Patents-in-Suit are invalid, Hilco is entitled to summary judgment on its non-infringement claims and on Eyeego's infringement counterclaims.

IV.   <u>Conclusion</u>

Because the claims of the '403 and '546 Patents are either anticipated by prior art or obvious in light of prior art, and because some of Eyeego's evidence is inadmissible, (1) Eyeego's <u>Motion for Summary Judgment Denying Declaratory Judgment of Invalidity of the '403 Patent and the '546 Patent</u> [#116] is DENIED; (2) Hilco's <u>Motion for Summary Judgment</u> [#161] is ALLOWED; (3) <u>Eyeego's Motion for Summary Judgment of Infringement of the '403 Patent</u> [#172] is DENIED; and (4) Hilco's <u>Motion to Strike the Declarations</u> [#191] in Eyeego's opposition to Hilco's motion for summary judgment is ALLOWED.

IT IS SO ORDERED.

September 26, 2016                                               /s/ Indira Talwani
                                                                United States District Judge